**Exhibit A**

COPY

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss                                                    SUPERIOR COURT

08-1352

|  |  |  |
|---|---|---|
| ART TECHNOLOGY GROUP, INC., a Delaware corporation, | X : | Civil No. |
| Plaintiff, | : | |
| v. | : | VERIFIED COMPLAINT |
| GSI COMMERCE, INC., a Delaware Corporation, HOSEIN MOGHADDAS, CARL VENTER, and SEAMUS WHITTINGHAM, | : : : | |
| Defendants. | : X | |

FILED IN THE OFFICE OF THE CLERK OF THE COURTS FOR THE COUNTY OF MIDDLESEX APR 0 2 2008

CLERK

For its Verified Complaint against GSI Commerce, Inc. ("GSI"), Hosein Moghaddas ("Moghaddas"), Carl Venter ("Venter"), and Seamus Whittingham ("Whittingham"), Art Technology Group, Inc. ("ATG") alleges as follows:

## INTRODUCTION

1.      This dispute arises from GSI's and Moghaddas's inducement of ATG employees Venter and Whittingham to breach the non-compete restrictions contained in employment contracts with ATG and accept employment with GSI.  GSI is a direct competitor of ATG, and Moghaddas knew of these fully-enforceable restrictions because he is a former ATG senior employee.

2.      Venter and Whittingham are United Kingdom-based ATG employees who possess confidential and proprietary ATG information and trade secrets.  Indeed, Whittingham was a Senior Account Executive with access to confidential client information including names, addresses, and confidential pricing and sales information

regarding ATG's existing clients and prospective clients, and Venter was a Solutions Engineering Manager with access to ATG's intellectual property and trade secrets.

3. Venter's and Whittingham's employment contracts with ATG adopt English law and prohibit them from accepting employment with an ATG competitor for a period of six (6) months following the termination of their employment with ATG. Such narrowly-tailored non-competition clauses are freely enforceable under English law. Based on Venter's and Whittingham's respective acceptance of employment with GSI, they each breached these contracts.

4. As a former senior ATG employee whose initial contract contained virtually identical non-compete language who now is employed by GSI, Moghaddas had knowledge of the "Post-Termination Restrictions" contained in their respective employment contracts. Nevertheless, Moghaddas, acting on behalf of GSI, recently recruited and solicited Venter and Whittingham to accept employment with GSI and, thereby, knowingly induced them to breach their employment contracts with ATG.

5. ATG now seeks injunctive relief: (1) prohibiting Moghaddas and GSI from inducing ATG employees, including Whittingham and Venter, from breaching their contracts with ATG; (2) enforcing Venter and Whittingham's employment contracts; and (3) prohibiting Venter and Whittingham from accepting employment at GSI for a period of six (6) months following their termination of employment with ATG.

6. ATG further seeks a declaration that Venter and Whittingham's employment contracts are valid and enforceable under English law and therefore Venter and Whittingham may not accept employment with GSI or any of ATG's competitors in

2

the United Kingdom for a period of six (6) months following the termination of their employment with ATG.

## PARTIES

7.    Plaintiff Art Technology Group, Inc. is a Delaware corporation with its principal place of business in Cambridge, Massachusetts.

8.    Defendant GSI Commerce, Inc. is a Delaware Corporation with its principal place of business in King of Prussia, Pennsylvania.  Upon information and belief, GSI Commerce, Inc. conducts business in Massachusetts.

9.    Defendant Hosein Modgaddas is a citizen of the United Kingdom, formerly employed by ATG and presently employed by GSI.  As a senior ATG employee, Modgaddas regularly conducted business with ATG and attended several meetings at ATG's office in Cambridge, Massachusetts.

10.    Defendant Carl Venter is a citizen of the United Kingdom, formerly employed by ATG and presently employed by GSI.  During his employment with ATG, Venter regularly conducted business with ATG's office in Cambridge, Massachusetts.

11.    Defendant Seamus Whittingham is a citizen of the United Kingdom, formerly employed by ATG and presently employed by GSI.  During his employment with ATG, Whittingham regularly conducted business with and attended meetings at ATG's office in Cambridge, Massachusetts.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this controversy under Mass. Gen. Laws ch. 212, §§ 3-4; ch. 223A, § 3; and ch. 231A, § 1.

3

13.    This Court may exercise personal jurisdiction over GSI, Moghaddas, Venter, and Whittingham because they transact business in Massachusetts and because they caused injury to ATG in Massachusetts.

14.    Venue is proper in this Court under Mass. Gen. Laws ch. 223, §§ 1 and 8.

15.    An actual, justifiable controversy exists among the parties.

16.    Declaratory relief for this controversy is available under Mass. Gen. Laws ch. 231A.

## STATEMENT OF CLAIM

17.    On November 13, 2000, Whittingham entered into an employment agreement with Primus Knowledge Solutions (UK) Limited/Inc. ("Primus") by countersigning a letter dated November 8, 2000 from Primus acknowledging that he agreed to the terms and conditions set forth in the letter (the "Whittingham Employment Agreement", attached hereto as Exhibit A).  Whittingham commenced employment with Primus on December 1, 2000.  At certain times during his employment, Whittingham reported directly to Moghaddas.

18.    On or about January 1, 2001, Moghaddas entered into an employment agreement with Primus by countersigning a letter dated December 21, 2000 from Primus acknowledging that he agreed to the terms and conditions set forth in the letter (the "Moghaddas Initial Employment Agreement", attached hereto as Exhibit B).

19.    On or about July 5, 2004[1], Venter entered into an employment agreement with Primus by countersigning a letter dated July 5, 2004 from Primus acknowledging that he agreed to the terms and conditions set forth in the letter (the "Venter

---

[1]    Venter dated his acceptance of the terms of employment June 5, 2004.  However, this appears to be an error, and the acceptance date should actually read July 5, 2004.

4

Employment Agreement", attached hereto as Exhibit C) (collectively, the Whittingham

Employment Agreement and the Venter Employment Agreement are referred to herein

as the "Employment Agreements"). Venter commenced employment with Primus on

August 1, 2004. At certain times during his employment, Venter reported directly to

Moghaddas.

20.    In fact, the cover letter accompanying the Venter Employment Agreement

stated that Venter would report directly to Moghaddas while at Primus. (Ex. C).

21.    Paragraph 15 of the Employment Agreements is entitled "Post-

Termination Restrictions" and states:

> During the period of six months after you leave employment you
> agree not to deal with or contact any client or prospective client or
> any individual on the company's database, with whom you have in
> the 12 months previously had dealings, nor seek to entice away
> any employee of the Company, if such contact in either case is
> directly or indirectly in connection with any competitive or related or
> similar business or for any customer of or supplier to the business.
>
> You also agree that for a period of six months following the
> termination of your employment you shall not be employed by, act
> as a consultant to, hold any office in, or be in any other way
> interested in any business which is shall be wholly or partly in
> competition with the Company or any Group Company within the
> United Kingdom.

Ex. A and Ex. C (the Employment Agreements) ¶ 15.  The Employment Agreements

explicitly adopt English law for their construction and interpretation (the Employment

Agreements ¶ 16).

22.    Paragraph 15 of Moghaddas's Initial Employment Agreement contains

identical language to that of the "Post-Termination Restrictions" language contained in

the Employment Agreements.

23.    In or about March 2007, ATG and Accretive Commerce, Inc. ("Accretive") entered into a Master License Agreement. The Master License Agreement contained a non-solicitation provision prohibiting Accretive from hiring any ATG employees. In or about August 2007, GSI acquired Accretive as a wholly owned subsidiary, merged operations with Accretive, assuming Accretive's business, including the ATG Master License Agreement. As such, the non-solicitation clause of the Master License Agreement also applied to GSI and prohibited GSI from hiring ATG employees.

24.    On or about November 1, 2004, ATG acquired Primus. Pursuant to the laws of the United Kingdom, by acquiring Primus, all Primus employment contracts transferred from Primus to ATG, and ATG assumed all of Primus's rights and obligations under the Employment Agreements. _See_ Transfer of Undertakings (Protection of Employment) Regulations 2006 (SI 2006/246) ("TUPE").

25.    On or about August 27, 2007, Moghaddas tendered his resignation to ATG.

26.    On August 31, 2007, ATG terminated Moghaddas' access to the company's internal systems and e-mail.

27.    Upon his resignation, Moghaddas told certain ATG executives that he would neither solicit ATG's employees nor recruit ATG's employees for future employment. At that point, Moghaddas was placed on "garden leave", meaning he would no longer work for ATG, but was required to adhere to the non-competition provisions of his employment agreement during a specified period of time, all while remaining on ATG's payroll.

6

28.     On October 9, 2007, ATG sent Moghaddas a letter confirming acceptance of Moghaddas' resignation tendered August 27, 2007. Pursuant to the terms of the letter, Moghaddas' final day of employment was November 26, 2007. The letter also reminded Moghaddas of the non-solicitation and proprietary information clauses in his employment agreement.

29.     Upon information and belief, Moghaddas became employed by GSI in or around late November 2007.

30.     In late March 2008, Moghaddas solicited and recruited Venter and Whittingham to terminate their employment with ATG and accept employment with GSI.

31.     When soliciting and recruiting Venter and Whittingham, Moghaddas did so for the benefit of GSI, under the direction of GSI, and with GSI's authority.

32.     Upon information and belief, at all relevant times, Moghaddas had knowledge of the "Post-Termination Restrictions" contained in paragraph 15 of the Employment Agreements.

33.     On March 25, 2008, Whittingham tendered his resignation to ATG and stated to ATG that he had accepted employment with GSI.

34.     At the time of his resignation, Whittingham was employed by ATG as a Senior Account Executive and had access to all of ATG's client lists. The client lists contained confidential and proprietary information regarding current clients, prospective clients, negotiations with those clients, and pricing and services provided to those clients.

35.     On March 31, 2008, Venter tendered his resignation to ATG and stated to ATG that he had accepted employment with GSI.

36.    At the times of his resignation, Venter was employed by ATG as a Solutions Engineering Manager and had access to ATG's trade secrets, including but not limited to computer source code and programming information.

37.    By accepting employment with GSI, Venter and Whittingham breached the "Post-Termination Restrictions" contained in paragraph 15 of the Employment Agreements.

38.    Moghaddas, acting on behalf of GSI as its agent, knowingly induced Venter and Whittingham to breach the Employment Agreements.

## COUNT I
## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS
### (AGAINST GSI AND MOGHADDAS)

39.    ATG repeats, realleges, and incorporates by reference as though fully set forth herein each and every allegation contained in Paragraphs 1 through 38 of this Complaint.

40.    Venter and Whittingham each respectively entered into the Venter Employment Agreement and the Whittingham Employment Agreement with Primus. The Employment Agreements are valid, binding, and enforceable employment contracts. Under the laws of England -- the law to be applied pursuant to paragraph 16 of the Employment Agreements -- the non-competition provisions of the Employment agreements are fully enforceable.

41.    Pursuant to English law, Primus' rights and obligations under the Employment Agreements transferred to ATG when ATG acquired Primus. As a result, the Employment Agreements are binding contracts between ATG on one hand and Venter and Whittingham on the other hand.

8

42.    Upon information and belief, GSI and Moghaddas had knowledge of the Employment Agreements and the "Post-Termination Restrictions" contained in paragraph 15 of the Employment Agreements.

43.    GSI and Moghaddas knowingly induced Venter and Whittingham to breach the Employment Agreements, specifically the "Post-Termination Restrictions" contain in paragraph 15.

44.    GSI's and Moghaddas' interference with the Employment Contracts was intentional and conducted with improper motives and means.

45.    As a result of GSI and Moghaddas' actions, ATG was damaged in an amount to be determined at trial and is threatened with imminent and irreparable harm to its business.

## COUNT II
## BREACH OF CONTRACT
### (AGAINST VENTER AND WHITTINGHAM)

46.    ATG repeats, realleges, and incorporates by reference as though fully set forth herein each and every allegation contained in Paragraphs 1 through 45 of this Complaint.

47.    Venter and Whittingham each respectively entered into the Venter Employment Agreement and the Whittingham Employment Agreement with Primus. The Employment Agreements are valid, binding, and enforceable employment contracts. More particularly, the non-competition provisions of the Employment Agreements are fully enforceable under the laws of England.

48.    Pursuant to English law, Primus' rights and obligations under the Employment Agreements transferred to ATG when ATG acquired Primus. As a result,

9

the Employment Agreements are binding contracts between ATG on one hand and Venter and Whittingham on the other hand.

49.    ATG performed all obligations required of it under the Employment Agreements or was excused from doing so.

50.    Paragraph 15 of the Employment Agreements contained "Post-Termination Restrictions."

51.    By negotiating and accepting employment with GSI, Venter and Whittingham breached the "Post-Termination Restrictions" contained in paragraph 15 of the Employment Agreements.

52.    As a result of Venter's and Whittingham's breach, ATG will be imminently and irreparably harmed.

## COUNT III
## DECLARATORY JUDGMENT
## (AGAINST VENTER AND WHITTINGHAM)

53.    ATG repeats, realleges, and incorporates by reference as though fully set forth herein each and every allegation contained in Paragraphs 1 through 52 of this Complaint.

54.    Venter and Whittingham each respectively entered into the Venter Employment Agreement and the Whittingham Employment Agreement with Primus. The Employment Agreements are valid, binding, and enforceable employment contracts. More particularly, the non-competition provisions of the Employment Agreements are fully enforceable under the laws of England.

55.    Pursuant to English law, Primus' rights and obligations under the Employment Agreements transferred to ATG when ATG acquired Primus. As a result,

10

the Employment Agreements are binding contracts between ATG on one hand and Venter and Whittingham on the other hand.

56.    Paragraph 15 of the Employment Contracts contained "Post-Termination Restrictions."

57.    An actual controversy exists between ATG and Venter and Whittingham regarding the enforceability of the Employment Agreements, specifically the "Post-Termination Restrictions."

58.    ATG therefore seeks declaratory relief as set forth in the Prayer for Relief.

### PRAYER FOR RELIEF

WHEREFORE, ATG requests that the Court:

A.    Enter an Order enjoining GSI and Moghaddas from soliciting any ATG employee and thereby inducing those employees to breach the "Post-Termination Restrictions" contained in their respective employment agreements with ATG;

B.    Enter an Order enjoining Venter and Whittingham from accepting employment with GSI in breach of the Employment Agreements and from divulging confidential ATG information or ATG trade secrets to anyone including GSI and Moghaddas;

C.    Enter an Order declaring that the Employment Agreements are valid and enforceable contracts between ATG on the one hand and Venter and Whittingham on the other hand, and therefore Venter and Whittingham may not accept employment with GSI or any of ATG's competitors for a

11

period of six (6) months following the termination of their employment with ATG;

D.    Enter judgment for ATG and against GSI and Moghaddas on Count I for damages in an amount to be determined at trial; and

E.    Order such further relief as the Court deems just and proper.

Dated: April 2, 2008                          Respectfully submitted,

Irwin B. Schwartz (BBO # 548763)
Jonathan M. Shine (BBO # 662183)
Michael G. Andrews (BBO # 663452)
Business Litigation Associates, P.C.
400 Blue Hill Drive, Suite 2
Westwood, Massachusetts 02090
Phone: 781-636-5000
Fax: 781-636-5090

Counsel for Plaintiff Art Technology
Group, Inc.

12

## VERIFICATION

I, David L. McEvoy, hereby certify that I have read the foregoing Verified Complaint and know the contents thereof and state, under the pains and penalties of perjury, that the allegations therein are, of my own personal knowledge, true and correct, except as to any allegations specifically identified as being made on information and belief. As to allegations in this Complaint made on information and belief, I am informed and believe that said allegations are true and correct.

Dated:  April 2, 2008

David L. McEvoy
Vice President & General Counsel
Art Technology Group, Inc.

13

**Exhibit A**

**A**

**PRIMUS**

November 8, 2000

Seamus Whittingham
6 Burdock Close
Bicester Oxfordshire OX26 3WS

Dear Seamus,

**Terms and Conditions of Employment**

This letter constitutes your contract of employment with Primus Knowledge Solutions
(UK) ("the Company") and incorporates the statement of terms required by law as of the
above date.

1. COMMENCEMENT/CONTINUITY

Your employment will commence on 1 December 2000. No previous service counts as
continuous for statutory purposes.

2. JOB TITLE AND DUTIES

You are to be employed as a *Sr. Account Executive*. You accept that the Company may,
at its discretion, require you to undertake other duties or tasks not within the scope of
your normal duties. At all times, you agree to faithfully and diligently perform those
duties and exercise those powers which are vested in you and to obey all lawful directions
of the Company.

3. PLACE OF WORK

Your place of work is the Company's UK Office located in Slough, or such other place of
business of the Company or any Group Company as the Company may reasonably
require within a 30 mile radius of your present location. For the purpose of this
Agreement, the term "Group Company" shall mean a company which, in relation to the
Company is the subsidiary or a holding company of it, or any company which is a
subsidiary of any such holding company ("holding company and "subsidiary" having the
meanings ascribed to them in Section 736 Companies Act 1985, as amended).

You may be required to travel extensively on business but you will not be required to
work outside the UK for longer than three months unless mutually agreed beforehand.

4. RENUMERATION AND BENEFITS

You are remunerated at a basic rate of £55,000 per annum. You may also receive
quarterly bonuses as described in the Sales Compensation Plan. You accept that the
Company may, at its absolute discretion, change its bonus or commission plans from year
to year, and that an entitlement in one year shall not give rise to the same or a similar
entitlement in any other.

You will be paid monthly in arrears by bank credit transfer and any performance related
remuneration will be paid at such times as set out in the then current compensation plan,
subject always to your remaining in the employment of the Company, and not serving any
period of notice of termination of employment (whether issued by the Company or you)
at that time.

**PRIMUS**

You may also from time to time be paid bonuses at the sole discretion of the Company, but these will not become part of your pay under this contract.

## 5. HOURS OF WORK

Your normal hours of work are 9 am to 5:30 pm Monday to Friday with one hour for lunch. You will be expected to work such additional hours as are necessary for the proper performance of your duties. You will not be paid extra for overtime.

The hours which you may be required to work here under are subject to the terms of any Relevant Agreement (as defined in the Working Time Regulations 1998 ("WTR")) applicable to you and the Individual Agreement (attached as schedule 2) opting out of the 48 hour per week limit in Regulation 4 of the WTR.

## 6. HOLIDAY ENTITLEMENT

In addition to statutory holidays, you are entitled to twenty days' paid annual holiday in each holiday year (which runs from 1st January to 31st December) to be taken at such time or times as may be agreed by your manager. Holiday not taken will be forfeited and may not be carried forward to the next year.

For the holiday year during which your appointment commences or terminates, your holiday entitlement will accrue at 1.66 days for each complete calendar month of your employment by the Company in that year. On termination of employment you will receive one two hundred and sixty$^{th}$ of annual basic salary for any untaken accrued holiday entitlement in the current holiday year. Similarly, the Company shall be entitled to deduct from any payments that you may be due any salary received for holiday taken in excess of your actual entitlement. The Company reserves the right to require you to take any outstanding holiday during any period of notice.

Your entitlement to statutory leave pursuant to the WTR shall be deemed to be included within the entitlements referred to in this Clause. You shall be deemed to use up your entitlement to statutory leave before any additional entitlement under this Agreement. The provisions of this Clause (as regards the timing of holidays and as regards calculating holiday pay on termination) shall be in substitution for those referred to in Regulations 15(2) and 14(3)(b) respectively of the WTR. This Agreement is a "Relevant Agreement" for the purposes of the WTR.

## 7. INCAPACITY FOR WORK

You will be paid statutory sick pay ("SSP") in respect of sick leave duly certified in accordance with statutory requirements. Your qualifying days for SSP are Monday to Friday. A self-certification form for SSP purposes is available from the Company. A doctors' certificate is required for any incapacity in excess of 7 days (including weekends), and for each 7 days that it continues.

In the event of sickness or injury you should notify your immediate report or a colleague by telephone (at or before your normal start time or as soon thereafter as you reasonably can) on the first morning of absence.

## 8. PENSION/CONTRACTING OUT

**PRIMUS**

There is an occupational pension scheme with this employment which you may be invited to join. A contracting-out certificate is in force.

### 9. TERMINATION

Notice of termination is by four (4) week's written notice on either side. After the fourth year, the notice of termination shall increase by one (1) additional week for every year of service completed thereafter (i.e. six years of employment = 6 week's notice of termination).

The Company may terminate this Agreement with immediate effect if you:
(a) commit any act of gross misconduct or repeats or continues (after written warning) any other material breach of your obligations under this Agreement;
(b) are guilty of conduct which in the reasonable opinion of the Company brings you, the Company, or any Group Company into disrepute;
(c) commit any act of dishonest, whether relating to the Company, and Group Company, any of its or their employees or otherwise; or
(d) is in the reasonable opinion of the Company incompetent in the performance of your duties.

On serving notice to terminate this Agreement for any reason, the Company shall be entitled (but not obliged) to pay you your basic salary in lieu of any unexpired period of notice.

The Company may at any time (including, but not limited to, during your notice period) require you to perform only some of your duties or alternative duties (as reasonably specified) or no specific duties and may also require you not to attend the offices of the Company unless specifically requested to attend during such period.

The normal retirement age is 60, at which time employment will automatically end in the absence of special agreement to the contrary.

### 10. CONFIDENTIALITY

As a condition of employment, you will be required to sign and return the Confidentiality and Inventions Assignment Agreement attached as schedule 3.

### 11. COMPUTER SECURITY

Misuse of the Company's computer programmes or data (including unlawful access to copying or tampering with the same) is a criminal offence under the Computer Misuse Act 1990 and shall render you liable to summary dismissal as well as risking possible criminal prosecution. You shall also comply with the terms of any computer security policy established by the Company.

**PRIMUS**

### 12. DISCIPLINARY PROCEDURES

At the present time, there are no disciplinary, grievance and appeals procedures connected with this employment; if any are introduced they will be available from the Company Personnel Department at Head Office.

In order to investigate any complaint of misconduct against you, the Company shall be entitled to suspend you on full pay for so long as may be necessary to carry out a proper investigation and hold a disciplinary hearing.

### 13. CHANGES IN TERMS AND CONDITIONS OF EMPLOYMENT

The Company reserves the right to make changes to these terms and conditions from time to time. Any such changes or other agreed changes in these particulars of employment will be notified in writing within 4 weeks of the change taking effect.

### 14. DISCHARGE OF LOANS

You agree to discharge any outstanding loans by the Company including any recoverable commission earnings or other advances of pay or overpayments upon the termination of your employment and you hereby authorise the Company to deduct the amount outstanding from any final pay due to you.

### 15. POST-TERMINATION RESTRICTIONS

During the period of six months after you leave employment you agree not to deal with or contact any client or prospective client or any individual on the company's database, with whom you have in the 12 months previously had dealings, nor seek to entice away any employee of the Company, if such contact in either case is directly or indirectly in connection with any competitive or related or similar business or for any customer of or supplier to the business.

You also agree that for a period of six months following the termination of your employment you shall not be employed by, act as a consultant to, hold any office in, or be in any other way interested in any business which is shall be wholly or partly in competition with the Company or any Group Company within the United Kingdom.

### 16. WHOLE AGREEMENT/JURISDICTION

This agreement together with your offer letter and the documents referenced and attached herein set out the whole agreement between the parties and shall be governed by English law and be subject to the non-exclusive jurisdiction of the English courts.

Please sign and return one copy of this letter as evidence of your agreement to its terms.

Yours sincerely,


For and on behalf of Primus Knowledge Solutions (UK) Limited/Inc.

I agree to the above:

Signed ........................... Dated...13ʰ November 2000

**PRIMUS**

SCHEDULE 2

WORKING TIME REGULATIONS

<u>INDIVIDUAL AGREEMENT TO OPT OUT OF THE 48-HOUR LIMIT</u>

I understand that under Regulation 4(1) of the Working Time Regulations ("the Regulations"), my average weekly working time, including overtime, normally should not exceed 48 hours.

However, under Regulation 4(3), I agree that this provision shall <u>not</u> apply to me, and that I voluntarily consent to exceed the 48-hour limit.

I understand that if I wish to re-consider my position regarding this opt-out of the Regulations, and to re-apply the 48-hour limit to my personal working week, I may do so by giving a minimum of three (3) months written notice to the Human Resources Department located in our Seattle corporate offices.

A copy of this Agreement is to be held in my Personnel file, and may be inspected by me on request.

Signed: _____

Name: _____SEAMUS L. WHITTINGHAM_____

Date: _____13th November 2000_____

**PRIMUS**

SCHEDULE 3 – Confidentiality and Inventions Assignment Agreement

## CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

In consideration of my employment as an employee with Primus Knowledge Solutions, Inc., including any or all of its subsidiaries and affiliates (collectively the "Company"), the opportunities for advancement that such employment provides me, the compensation paid to me by the Company, the understandings set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I agree as follows:

### Section 1. Definitions

Whenever used in this Agreement, the following terms will have the following meanings:

1.1     "**Confidential Information**" means any information that (a) relates to the business of the Company, (b) is not generally available to the public, and (c) is conceived, compiled, developed, discovered or received by, or made available to me during the Term, whether solely or jointly with others, and whether or not while engaged in performing work for the Company. Without limiting the generality of the foregoing, Confidential Information includes information relating to Inventions or trade secrets, products, services, finances, business plans, marketing plans, legal affairs, suppliers, clients and potential clients, opportunities, contracts or assets of the Company. Confidential Information also includes any information which has been made available to the Company by another Person and which the Company is obligated to keep confidential.

1.2     "**Invention**" means any product, computer program, device, technique, know-how, algorithm, method, process, improvement, discovery or invention, whether or not patentable or copyrightable and whether or not reduced to practice, that (a) is within the scope of the Company's business, research or investigations or results from or is suggested by any work performed by me for the Company and (b) is created, reduced to practice, developed, discovered, invented or made by me during the Term, whether solely or jointly with others, and whether or not while engaged in performing work for the Company.

1.3     "**Material**" means any product, prototype, model, document, diskette, tape, picture, drawing, design, recording, paper, writing or other tangible item which contains or manifests, whether in printed, handwritten, coded, magnetic or other form, any Confidential Information or Invention.

1.4     "**Moral Rights**" means any right to claim authorship of a work, any right to object to any distortion or other modification of the work, and any similar right existing under the law of any country in the world or under any treaty.

1.5     "**Person**" means any corporation, partnership, trust, association, governmental authority, educational institution, individual or other entity.

1.6     "**Proprietary Right**" means any patent, copyright, mask work, trade secret, trade mark, trade name, service mark or other intellectual property right in any Confidential Information, Invention or Material.

1.7     "**Term**" means the term of my employment with the Company, whether on a full-time, part-time or consulting basis.

**PRIMUS·**

## Section 2. Confidential Information, Inventions and Materials; Moral Rights Waiver

2.1     The Company will be the exclusive owner of all Confidential Information, Inventions, Materials and Proprietary Rights. To the extent applicable, all Materials constitute "works for hire" under applicable copyright laws.

2.2     I hereby assign and transfer, or will assign and transfer, to the Company all right, title and interest that I may now or hereafter have in the Confidential Information, Inventions, Materials and Proprietary Rights, subject to the limitations set forth in the notice below. I will take such action as may be requested by the Company to evidence, transfer, or confirm the Company's right, title and interest in the Confidential Information, Inventions, Materials and Proprietary Rights. I will not contest the validity of any Proprietary Rights.

2.3     Except as required for performance of my work for the Company or as authorized in writing by the Company, I will not (a) use, disclose, publish or distribute any Confidential Information, Inventions or Materials or (b) remove any Materials from the Company's premises. I will hold all Materials in trust for the Company and I will deliver them to the Company upon request and in any event at the end of the Term.

2.4     I will promptly disclose to the Company all Confidential Information, Inventions and Materials, as well as any business opportunity which comes to my attention during the Term and which relates to the business of the Company or which arises as a result of my employment with the Company. I will not take advantage of or divert any such opportunity for the benefit of myself or anyone else without the prior written consent of the Company.

2.5     I hereby irrevocably transfer and assign to the Company any and all Moral Rights that I may have in any work I create for and/or on behalf of the Company. I also forever hereby waive and agree never to assert against the Company, its successors and assigns any and all Moral Rights that I may have in any work, even after expiration or termination of my employment with the Company, howsoever arising.

**NOTICE:** Notwithstanding any other provision of this Agreement to the contrary, this Agreement does not obligate me to assign or offer to assign to the Company any of my rights in an invention for which no equipment, supplies, facilities or trade secret information of the Company was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the Company or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the Company. This satisfies the written notice and other requirements of RCW 49.44.140.

### Section 3. No Conflicting Obligations

3.1     My execution, delivery and performance of this Agreement and the performance of my other obligations and duties to the Company will not violate any other employment, nondisclosure, confidentiality, consulting or other agreement to which I am a party or by which I may be bound.

3.2     I will not use in performance of my work for the Company or disclose to the Company any trade secret, confidential or proprietary information of any prior employer or other Person if and to the extent that such use or disclosure may violate any obligation or duty that I owe to such other Person (e.g., under any agreement or applicable law). My compliance with this paragraph will not prohibit, restrict or impair the performance of my work, obligations and duties to the Company.

**PRIMUS**

### Section 4. Miscellaneous

**4.1**    This Agreement is not a contract of employment and no rights of employment are hereby created.

**4.2**    The provisions of this Agreement shall continue to apply after the termination of my employment without limit in point of time, but shall cease to apply to information which may come into the public domain through no fault of my own. I acknowledge, however, that any breach of this Agreement constitutes a disciplinary offence, which may result in the summary termination of my employment with the Company.

**4.3**    In the event of any breach of or default under this Agreement by me, the Company may suffer irreparable harm and have no adequate remedy at law. In the event of any such breach or default, or any threat of such breach or default, the Company will be entitled to injunctive relief, specific performance and other equitable relief. The rights and remedies of the Company under this paragraph are in addition to, and not in lieu of, any other right or remedy afforded to the Company under any other provision of this Agreement, by law or otherwise.

**4.4**    This Agreement will be enforced to the extent permitted by applicable law. If for any reason any provision of this Agreement is held to be invalid or unenforceable to any extent, then (a) such provision will be interpreted, construed or reformed to the extent reasonably required to render the same valid, enforceable and consistent with the original intent underlying such provision, and (b) such invalidity or unenforceability will not affect any other provision of this Agreement or any other agreement between the Company and me. If the invalidity or unenforceability is due to the unreasonableness of the scope or duration of the provision, the provision will remain effective for such scope and duration as may be determined to be reasonable.

**4.5**    The failure of the Company to insist upon or enforce strict performance of any other provisions of this Agreement or to exercise any of its rights or remedies under this Agreement will not be construed as a waiver or a relinquishment to any extent of the Company's rights to assert or rely on any such provision, right or remedy in that or any instance; rather, the same will be and remain in full force and effect.

**4.6**    This Agreement sets forth the entire Agreement, and supersedes any and all prior agreements, between me and the Company with regard to the Confidential Information, Inventions, Materials and Proprietary Rights of the Company. This Agreement may not be amended, except by writing signed by the party against whom such amendment is sought to be enforced.

**4.7**    This agreement shall be governed by the English law and be subject to the non-exclusive jurisdiction of the English courts. Further, I will not bring any action relating to this Agreement other than in the court specified in this paragraph.

**4.8**    I have carefully read all of the provisions of this Agreement and agree that (a) the same are necessary for the reasonable and proper protection of the Company's business, (b) the Company has been induced to enter into and continue its relationship with me in reliance upon my compliance with the provisions of this Agreement, (e) every provision of this Agreement is reasonable with respect to its scope and duration, and (d) I have received a copy of this Agreement.

**PRIMUS**

This Agreement shall be effective as of ___1st December___, 2000.

_____
Signature

SEAMUS RICHARD WHITTINGHAM
FULL NAME (print or type)

NB 47 48 976
Social Security Number

**ACCEPTED:** Primus Knowledge Solutions

_____
Diana Wong, Vice President, Human Resources

**Exhibit B**

**B**

# Art Technology Group (Europe) Ltd

## CONTRACT OF EMPLOYMENT

This document sets out your principal terms and conditions of employment which incorporates the written particulars required by the Employment Rights Act 1996, and together with the Company Policies, Rules and Regulations published by Art Technology Group (Europe) Ltd constitutes the Contract of Employment between:

**Hosein Moghaddas** (Employee)

and

**Art Technology Group (Europe) Ltd** (Company)

Your permanent employment commenced with Art Technology Group (Europe) Ltd on 29 October 2004.

Your continuous employment for statutory purposes commenced on 1 January 2001.

1

Your main Terms and Conditions are set out below:

**Job Title:**          VP EMEA

**Appointment:**          Your duties will be fully explained to you when you commence employment with the Company. It is the Company's intention that any oral instructions or written descriptions of your job duties and responsibilities should serve as a guide to the major areas for which you will be accountable. Because of the changing nature of the business, the obligations upon you will inevitably vary and develop. The Company reserves the right at any time during your employment, upon reasonable notice, to require you to undertake any reasonable duties which fall within your capabilities.

**Reporting Managers Title:**          SVP Worldwide Sales.     From time to time we review our organisation arrangements. Therefore, your reporting line may be subject to change.

**Salary:**          Your basic salary is £100,000 per annum, payable monthly by direct credit transfer to your personal bank or building society account on 26th of each month or the nearest working day.

There is no contractual entitlement to any increase in your basic salary, but you will be notified in writing, in any case, where there is any change to your salary. Salaries are reviewed annually, and are related to market, performance and the company's ability to pay. An itemised pay statement of your earnings and deductions will be given to you at the end of each month.

The Company shall be entitled to deduct from your salary and such other monies as may be payable to you all sums owing or otherwise payable to you from the Company. Examples of the circumstances in which such deductions may be made include, but shall not be limited to, where you have received more holiday or sick pay than is due to you, your pay or expenses or any other payment made to you have been overpaid, or outstanding repayments due to the business upon your leaving the Company, or where you have any period of unauthorised leave or non attendance from work.

**Incentive/Bonus Scheme:**          Your on-target variable salary is £100,000 per annum, payable in accordance with your Sales Compensation Plan, which is based on regional revenue (Product, S&M, Hosting, Professional Services and Education), and is reviewed and agreed annually on 1 January.

We reserve the right to vary bonus schemes from time to time.

**Hours of Work:**          Your normal hours are 42.50 per week (including a daily one hour period for lunch). Your exact starting and finishing times will be dependant upon changing business needs and will be decided by your manager.

The Company will be as flexible as possible in the organisation of your hours of work outside the hours of 9.00 and 17.30 Monday to Friday

However, you will be required to work such other or additional hours as are necessary without additional payment unless by special arrangement agreed with your manager in advance.

You and the Company agree that the 48 hour weekly working time limit under Regulation 4(1) of the Working Time Regulations 1998 does not apply to you.

2

This agreement shall apply indefinitely but shall be terminable by you giving three months written notice to the Company.

**Payment of Expenses:** Expenses wholly and reasonably incurred while travelling on Company business will be reimbursed. For full details please see the Business Expenses Policy.

**Location:** Your place of work will initially be at the Company's office at Apex Plaza, Forbury Road, Reading, RG1 1AX. However, from time to time, you may be required to work elsewhere on a temporary basis.

**Mobility:** You will be required to work at any location determined by the Company from time to time but, if you are transferred on a permanent basis to another location, you may be eligible for reimbursement of certain reasonable expenses incurred solely as a result of the relocation at a rate and for such period as the Company shall decide at its absolute discretion.

**Probationary Period** In light of your previous service with Primus, your employment will not be subject to any probationary period.

**Pension:** You will be entitled to participate in the Company's Group Personal Pension Plan.

**Death in Service Benefit:** Subject to acceptance by the Company's insurers, you will be entitled to free death in service benefit to the value of four times your basic salary.

**Retirement:** The current normal retirement age is 60 years.

**Private Medical Insurance:** The Company will provide you, your spouse, and dependant children with private medical insurance under the terms and conditions determined by the Insurer. The Company reserves the right to vary the scheme from time to time. This is a taxable benefit and participation is voluntary.

**Holidays:** The holiday year runs from 1 January to 31 December each year. In addition to Bank and Public Holidays, you are entitled to 23 days holiday per annum, to be taken at such time as may be approved by the Company.
On termination of employment, holiday pay will be calculated according to length of service in the current holiday year less any holiday already taken during that year. The Company will adjust your pay to reflect any surplus or deficit of holiday entitlement at date of termination.

**Notification of Absence:** Whenever you are unable to attend work for whatever reason, including sickness, you must inform your manager as soon as reasonably practicable on the first day of absence.

**Sick Leave and Pay:** In accordance with the Company absence Policy you are entitled to 3 months full pay and 3 months half pay in one calendar year.

Periods of sickness of seven days or less must be covered by a self-certificate on return to work. Periods of sick absence in excess of seven days must be covered by a doctor's certificate.

**Notice:** You will be entitled to receive from the Company and will be required to give

three months' notice in writing to terminate your contract.

In case of gross misconduct, no notice or pay in lieu of notice will be due.

The Company reserves the right to make a payment in lieu of notice should it so wish or to require you to remain away from work during your notice period whichever may be appropriate. Any payment in lieu of notice will have PAYE, and Class 1 National Insurance deducted at source.

**Use of Computers:** You are required to comply with the ATG Internet, Email, and Electronic Media Policy. Failure to comply with your obligations as set out in this policy may result in disciplinary action being taken against you including, in appropriate cases, dismissal.

**Confidentiality: Communication with the Media:** You must not make contact with or communicate with any member of the press, media, or anyone so connected, on behalf of the Company (other than in the proper performance of your duties) unless you have obtained prior written permission from the Company.

You are not permitted to publish any letters, articles or otherwise purporting to represent the Company (other than in the proper performance of your duties) unless you have obtained prior permission in writing from the Company. Failure to comply with any of these provisions will be regarded as gross misconduct for which you may be liable to summary dismissal.

**Grievances:** Should you have any grievance in relation to your employment, you should speak with your immediate line manager either orally or in writing, and follow the procedure set down in the Company Policy.

**Disciplinary Procedure:** The Company has detailed disciplinary procedures for dealing with misconduct and poor performance issues. It operates so that employees are treated fairly and consistently and everyone is given a chance to improve their conduct and their performance. These are set out in the Company Policy in the section dealing with Disciplinary Rules and Procedures. Please make sure that you read and fully understand them since you are expected to comply with all the rules set out in the procedure.

Until you have obtained 12 months continuity of service with the Company, it reserves the right to terminate the contract with proper notice where appropriate or pay in lieu of notice in the case of the poor performance or unacceptable conduct (not amounting to gross misconduct, where the Company may dismiss you without notice or pay in lieu of notice) without reference to the disciplinary rules and procedures set out in the Company Policy.

**Health, Safety and Welfare:** You are required to comply with all the Company's health and safety rules and regulations and in particular to:

a)    take reasonable care for your own health and safety and that of others in their workplace;

b)    co-operate with the Company on health and safety and that of others in their workplace;

c)    not to interfere with or misuse anything provided for the health, safety

4

|  | and welfare of those working or visiting the Company's premises. |
|---|---|
| **Copying:** | You are not permitted to make any copy, abstract, summary or précis of the whole or part of any document belonging to the Company except where authorised to do so in the proper performance of your duties. |
| **Data Protection:** | In order to keep and maintain records relating to your employment it will be necessary for the Company to record, keep and process personal data and sensitive personal data relating to you. This data may be recorded, kept and processed on computer and in hard copy form. To the extent that it reasonably necessary in connection with your employment and the performance of the Company's responsibilities as an employer, it may be necessary for the Company to disclose this data to others, including other employees of the Company, the Company's professional advisers, the Inland Revenue and other authorities, and Group Companies. You consent to the recording, processing, use and disclosure by the Company of personal data and sensitive personal data relating to you as set out above, (including, for the avoidance of doubt, for the purpose of paragraph 1 of schedule 4 of the Data Protection Act 1998). This consent cannot be withdrawn by you. This does not affect your rights as a data subject or the Company's obligations and responsibilities under the Data Protection Act 1984 and /or the Data Protection Act 1998. For the purposes of these Acts, the Company has nominated the company secretary as it's representative. |
| **Subscriptions To Professional Bodies:** | At its discretion the Company will reimburse you one annual membership subscription to a professional body or association, subject to production of satisfactory receipts. |
| **Return of Company Property On Leaving Employment:** | You are required to deliver to the Company before the end of your employment however arising or immediately thereafter, should your employment terminate without notice, all papers, documents, identification cards, credit cards, keys and all property belonging to the Company. You will be required to sign an undertaking that all property has been duly returned. |
| **Collective Agreements:** | There are no collective bargaining agreements applicable to your position. |
| **Protective Covenant:** | For the purposes of this clause the following definitions apply: |

"**Relevant Period**" means the period of 12 months preceding the date on which your employment terminates;

"**Relevant Area**" means the United Kingdom.

"**Company**" means Art Technology Group (Europe) Ltd and any associated Company or subsidiary Company, whether registered in the UK or abroad, with which you were actively engaged or concerned and had direct contact.

"**Senior Employee**" includes but is not limited to major account managers, strategic account managers and country alliance managers.

For a period of six months following the date on which your employment terminates, this period to be reduced by the amount of time spent on garden leave, you shall not, alone or with others, whether directly or indirectly, and whether for the benefit of yourself or any person other than the Company

5

within the Relevant Area:

(a) solicit, induce, encourage, attempt to solicit, induce or encourage (whether directly or indirectly) any employee with whom you had material contact during the Relevant Period, who is employed by or who renders services to the Company and who works in a managerial capacity or who is a Senior Employee of the Company or who has responsibility for clients of the Company, to terminate their employment with or otherwise cease their relationship with the Company and similarly will not, whether directly or indirectly, employ, engage or offer employment to or an engagement to any such person.

**Proprietary Information:**

The Company believes that you should be aware of what is happening in terms of the Company's business; however, much of this information is confidential. <u>The following conditions are very important and you should read them carefully:</u>

For the purposes of this section **Proprietary Information**, the following definitions shall apply:

"Confidential Information" shall mean all Know-how and Marketing Information and any other commercial, financial, technical or other confidential information (including but without prejudice to the generality of the foregoing, trade secrets, secret formula or secret process) concerning the organisation, business, finances, transactions and affairs of the Company and any Group Company (meaning all subsidiaries of the Company, a holding company of the Company and any subsidiaries thereof, and any companies over which the Company has control within the meaning of section 840 of the Income and Corporation Taxes Act 1988) and of their customers and prospective customers which you may have received or obtained during the course of your employment with the Company or any Company;

"Know-how" shall mean information (including but without prejudice to the generality of the foregoing that comprised in formulae, specifications, designs, drawings, component lists, databases, software (and /or any preparatory design), manuals, instructions and catalogues) held in whatever form relating to the production, creation, supply or provision of the products or services of the Company; and

"Marketing Information" shall mean information relating to the marketing or sales of any products or services of the Company or any Group Company, including but without prejudice to the generality of the foregoing, lists of customers' and suppliers' names, addresses and contacts, sales targets and statistics, market share and pricing statistics, marketing surveys, research reports and advertising and promotional material.

You shall not at any time whether during or after the termination of your employment with the Company under this agreement (except in the proper performance of your duties under this agreement):

Directly or indirectly make use of or divulge or communicate to any person, firm, Company or organisation any of the Confidential Information (including for this purpose any Confidential Information obtained prior to the date of this

6

agreement during your period of continuous employment with the Company); or to copy or reproduce (or permit or enable others to copy or reproduce) in any form or by or any media or device, documents, discs, tapes or other material containing or referring to Confidential Information.

All documents (including copies), discs, tapes and other material held by you containing or referring to Confidential Information or relating to the affairs and businesses of the Company or any Group Company (and whether or not prepared by you or supplied to you by the Company) shall be the property of the Company and shall be delivered by you to the Company forthwith upon request and in any event upon the termination of your employment by the Company however arising. If requested by Company Senior Management, you shall delete any Confidential Information from any re-usable material.

You will not without the prior approval of the Company make any statement (whether written or oral) to any representative of television, radio, film or other similar media and will not write any articles for the press or otherwise for publication on any matter on or relating to the business and affairs of the Company or any Group Company (to include without limitation any matter relating to any client of the Company or any Group Company). Further, you shall not make any statement to any third party in circumstances such that you ought reasonably to be aware or suspect or believe that such third party will pass on such statement to any such representative.

**If any provision in the above clause shall be held to be illegal or unenforceable, in whole or in part, such provision shall be deemed not to form part of this Clause, but the enforceability of the other provisions in this Statement shall not be affected.**

For the avoidance, all legal and beneficial rights to Confidential Information belong exclusively to the Company

You will not acquire by implication or otherwise any right in, or title to, Confidential Information.

Inventions:    You acknowledge that in the course of your employment and as part of your duties you may conceive or make, individually or with others, certain inventions, ideas, discoveries, developments, writings, designs, drawings, improvements and innovations, whether or not patentable, or capable of registration (collectively, "Inventions") and you may develop or produce, individually or with others, certain works in which copyright and/or unregistered design right will subsist in various media, including but not limited to electronic materials, computer software, apparatus and equipment (collectively "Creative Works") and agree that you will promptly disclose in writing to the Company the existence of and details relating to all Inventions and Creative Works.

"Intellectual Property" in this section means patents, trade marks and service marks, rights in designs, trade or business names, copyrights (including rights in computer software) (whether or not registered or whether an application for registration is pending) and all rights or forms of protection of a similar nature or having equivalent or similar effect to any of these which may subsist anywhere in the world.

You acknowledge that any Inventions or Creative Works, and any Intellectual Property subsisting or which may in the future subsist in such Inventions or

7

Creative Works, whether or not conceived or made during working hours and including, without limitation those which:

Relate directly to the business or any Group Company or to their actual or anticipated activities; or

Result from or are made in the course of your employment by the Company or any Group Company; or

involve directly the use of any equipment, supplies, facilities, confidential information, documents, Intellectual Property of the Company or any Group Company

will on creation vest in and be the exclusive property of the Company or the Group Company (as the case may be) in the United Kingdom or any other part of the world and where the same does not automatically vest a aforesaid you agree at the cost of the Company to assign the same to the Company or the Group Company (as the case may be) and that you will not exploit any right of the Company or any Group Company in any inventions, Creative Works and Intellectual Property for any purpose except in the proper performance of your duties under this agreement.

You agree that without limitation to the foregoing:

Any invention disclosed by you to a third person or described in a patent or registered design application filed by you or on your behalf; and

any Creative Work disclosed to a third person, published or the subject of an application for copyright or other registration filed by you or on your behalf;

during or within six (6) months following termination of your employment with the Company will be presumed to have been written, developed, produced, conceived or made by you during your employment, unless proved by you to have been written, developed, produced, conceived or made by you following its termination.

You will also at the Company's request and expense, execute specific assignments of any Invention or Creative Work and execute and deliver such other documents and take such further action as the Company may reasonably require, at any time during or subsequent to the period of your employment, to vest or evidence title in Inventions and Creative Works in the Company or any Group Company (as the case may be) and to obtain, maintain and defend the Intellectual Property in the Inventions or Creative Works in any an all countries or to otherwise give effect to the provisions of this section.

You hereby irrevocably appoint the Company to be your attorney in your name and on your behalf to execute and to do any such instrument or thing and generally to use your name for the purpose of giving to the Company or its nominee the full benefit of the provisions of this section and acknowledge that a certificate in writing signed by any director or the secretary of the Company that any instrument or act falls within the authority hereby conferred shall be conclusive evidence that such is the case.

You shall not knowingly do or permit to be done any act or omit to do any act which might imperil, jeopardise or prejudice any of the rights referred to in this

8

section or which might invalidate or prejudice any application made by the Company or any Group Company for a patent, registered design, copyright, design right or other similar right in any part of the world.

Law of Contract:       This contract will be interpreted and operate in accordance with English Law.

Signed:            _____
                   (on behalf of Art Technology Group (Europe) Ltd)

Date:              _____

I have read, understood and agreed to the terms and conditions of employment as stated and referred to in this document which are relevant to my employment with Art Technology Group (Europe) Ltd.

Signed:            _____
                   (Employee)

Print Name         _____

Date               _____

9

**PRIMUS**

→ www.primus.com

December 21, 2000

Hosein Moghaddas

Dear Hosein,

**Terms and Conditions of Employment**

This letter constitutes your contract of employment with Primus Knowledge Solutions (UK) ("the Company") and incorporates the statement of terms required by law as of the above date.

### 1. COMMENCEMENT/CONTINUITY

Your employment will commence on January 1st, 2001. No previous service counts as continuous for statutory purposes.

### 2. JOB TITLE AND DUTIES

You are to be employed as a *UK Sales Director*. You accept that the Company may, at its discretion, require you to undertake other duties or tasks not within the scope of your normal duties. At all times, you agree to faithfully and diligently perform those duties and exercise those powers which are vested in you and to obey all lawful directions of the Company.

### 3. PLACE OF WORK

Your place of work is the Company's UK Office located in Slough, or such other place of business of the Company or any Group Company as the Company may reasonably require within a 30 mile radius of your present location. For the purpose of this Agreement, the term "Group Company" shall mean a company which, in relation to the Company is the subsidiary or a holding company of it, or any company which is a subsidiary of any such holding company ("holding company and "subsidiary" having the meanings ascribed to them in Section 736 Companies Act 1985, as amended).

You may be required to travel extensively on business but you will not be required to work outside the UK for longer than three months unless mutually agreed beforehand.

### 4. RENUMERATION AND BENEFITS

You are remunerated at a basic rate of £85,000 per annum. You may also receive quarterly bonuses/commissions based on a Year 2001 Sales Compensation Plan (a copy of which shall be given to you upon commencement of employment). Primus reserves the right to change its bonus/commission policy at any time for any reason. You accept that the Company may, at its absolute discretion, change its bonus or commission plans from year to year, and that an entitlement in one year shall not give rise to the same or a similar entitlement in any other.

You will be paid monthly in arrears by bank credit transfer and any performance related remuneration will be paid at such times as set out in the then current compensation plan, subject always to your remaining in the employment of the Company, and not serving any

1601 Fifth Avenue → Suite 1900 → Seattle, Washington 98101 → 206.292.1000 Main → 206.292.1825 Fax

**PRIMUS**

period of notice of termination of employment (whether issued by the Company or you) at that time.

You may also from time to time be paid bonuses at the sole discretion of the Company, but these will not become part of your pay under this contract.

## 5. HOURS OF WORK

Your normal hours of work are 9 am to 5:30 pm Monday to Friday with one hour for lunch. You will be expected to work such additional hours as are necessary for the proper performance of your duties. You will not be paid extra for overtime.

The hours which you may be required to work here under are subject to the terms of any Relevant Agreement (as defined in the Working Time Regulations 1998 ("WTR")) applicable to you and the Individual Agreement (attached as schedule 2) opting out of the 48 hour per week limit in Regulation 4 of the WTR.

## 6. HOLIDAY ENTITLEMENT

In addition to statutory holidays, you are entitled to twenty days' paid annual holiday in each holiday year (which runs from 1st January to 31st December) to be taken at such time or times as may be agreed by your manager. Holiday not taken will be forfeited and may not be carried forward to the next year.

For the holiday year during which your appointment commences or terminates, your holiday entitlement will accrue at 1.66 days for each complete calendar month of your employment by the Company in that year. On termination of employment you will receive one two hundred and sixty$^{th}$ of annual basic salary for any untaken accrued holiday entitlement in the current holiday year. Similarly, the Company shall be entitled to deduct from any payments that you may be due any salary received for holiday taken in excess of your actual entitlement. The Company reserves the right to require you to take any outstanding holiday during any period of notice.

Your entitlement to statutory leave pursuant to the WTR shall be deemed to be included within the entitlements referred to in this Clause. You shall be deemed to use up your entitlement to statutory leave before any additional entitlement under this Agreement. The provisions of this Clause (as regards the timing of holidays and as regards calculating holiday pay on termination) shall be in substitution for those referred to in Regulations 15(2) and 14(3)(b) respectively of the WTR. This Agreement is a "Relevant Agreement" for the purposes of the WTR.

## 7. INCAPACITY FOR WORK

You will be paid statutory sick pay ("SSP") in respect of sick leave duly certified in accordance with statutory requirements. Your qualifying days for SSP are Monday to Friday. A self-certification form for SSP purposes is available from the Company. A doctors' certificate is required for any incapacity in excess of 7 days (including weekends), and for each 7 days that it continues. After 90 days permanent health insurance coverage is available subject to the rules of the scheme.

In the event of sickness or injury you should notify your immediate report or a colleague by telephone (at or before your normal start time or as soon thereafter as you reasonably can) on the first morning of absence.

**PRIMUS**

### 8. PENSION/CONTRACTING OUT

There is an occupational pension scheme with this employment which you may be invited to join. A contracting-out certificate is in force.

### 9. TERMINATION

Notice of termination is by four (4) week's written notice on either side. After the fourth year, the notice of termination shall increase by one (1) additional week for every year of service completed thereafter (i.e. six years of employment = 6 week's notice of termination).

The Company may terminate this Agreement with immediate effect if you:
(a) commit any act of gross misconduct or repeats or continues (after written warning) any other material breach of your obligations under this Agreement;
(b) are guilty of conduct which in the reasonable opinion of the Company brings you, the Company, or any Group Company into disrepute;
(c) commit any act of dishonest, whether relating to the Company, and Group Company, any of its or their employees or otherwise; or
(d) is in the reasonable opinion of the Company incompetent in the performance of your duties.

On serving notice to terminate this Agreement for any reason, the Company shall be entitled (but not obliged) to pay you your basic salary in lieu of any unexpired period of notice.

The Company may at any time (including, but not limited to, during your notice period) require you to perform only some of your duties or alternative duties (as reasonably specified) or no specific duties and may also require you not to attend the offices of the Company unless specifically requested to attend during such period.

The normal retirement age is 60, at which time employment will automatically end in the absence of special agreement to the contrary.

### 10. CONFIDENTIALITY

As a condition of employment, you will be required to sign and return the Confidentiality and Inventions Assignment Agreement attached as schedule 3.

### 11. COMPUTER SECURITY

Misuse of the Company's computer programmes or data (including unlawful access to copying or tampering with the same) is a criminal offence under the Computer Misuse Act 1990 and shall render you liable to summary dismissal as well as risking possible criminal prosecution. You shall also comply with the terms of any computer security policy established by the Company.

## PRIMUS

### 12. DISCIPLINARY PROCEDURES

At the present time, there are no disciplinary, grievance and appeals procedures connected with this employment; if any are introduced they will be available from the Company Personnel Department at Head Office.

In order to investigate any complaint of misconduct against you, the Company shall be entitled to suspend you on full pay for so long as may be necessary to carry out a proper investigation and hold a disciplinary hearing.

### 13. CHANGES IN TERMS AND CONDITIONS OF EMPLOYMENT

The Company reserves the right to make changes to these terms and conditions from time to time. Any such changes or other agreed changes in these particulars of employment will be notified in writing within 4 weeks of the change taking effect.

### 14. DISCHARGE OF LOANS

You agree to discharge any outstanding loans by the Company including any recoverable commission earnings or other advances of pay or overpayments upon the termination of your employment and you hereby authorise the Company to deduct the amount outstanding from any final pay due to you.

### 15. POST-TERMINATION RESTRICTIONS

During the period of six months after you leave employment you agree not to deal with or contact any client or prospective client or any individual on the company's database, with whom you have in the 12 months previously had dealings, nor seek to entice away any employee of the Company, if such contact in either case is directly or indirectly in connection with any competitive or related or similar business or for any customer of or supplier to the business.

You also agree that for a period of six months following the termination of your employment you shall not be employed by, act as a consultant to, hold any office in, or be in any other way interested in any business which is shall be wholly or partly in competition with the Company or any Group Company within the United Kingdom.

### 16. WHOLE AGREEMENT/JURISDICTION

This agreement together with your offer letter and the documents referenced and attached herein set out the whole agreement between the parties and shall be governed by English law and be subject to the non-exclusive jurisdiction of the English courts.

Please sign and return one copy of this letter as evidence of your agreement to its terms.

Yours sincerely,

For and on behalf of Primus Knowledge Solutions (UK) Limited/Inc.

I agree to the above:

Signed ................................. Dated. 28ᵗʰ December 2000

**PRIMUS**

## SCHEDULE 2

## WORKING TIME REGULATIONS

## INDIVIDUAL AGREEMENT TO OPT OUT OF THE 48-HOUR LIMIT

I understand that under Regulation 4(1) of the Working Time Regulations ("the Regulations"), my average weekly working time, including overtime, normally should not exceed 48 hours.

However, under Regulation 4(3), I agree that this provision shall **not** apply to me, and that I voluntarily consent to exceed the 48-hour limit.

I understand that if I wish to re-consider my position regarding this opt-out of the Regulations, and to re-apply the 48-hour limit to my personal working week, I may do so by giving a minimum of three (3) months written notice to the Human Resources Department located in our Seattle corporate offices.

A copy of this Agreement is to be held in my Personnel file, and may be inspected by me on request.

Signed: _____

Name: ____H. MOSHADDAS_____

Date: ____26th December 2000_____

## PRIMUS

SCHEDULE 3 – Confidentiality and Inventions Assignment Agreement

## CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

In consideration of my employment as an employee with Primus Knowledge Solutions, Inc., including any or all of its subsidiaries and affiliates (collectively the "Company"), the opportunities for advancement that such employment provides me, the compensation paid to me by the Company, the understandings set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I agree as follows:

### Section 1. Definitions

Whenever used in this Agreement, the following terms will have the following meanings:

1.1    "Confidential Information" means any information that (a) relates to the business of the Company, (b) is not generally available to the public, and (c) is conceived, compiled, developed, discovered or received by, or made available to me during the Term, whether solely or jointly with others, and whether or not while engaged in performing work for the Company. Without limiting the generality of the foregoing, Confidential Information includes information relating to Inventions or trade secrets, products, services, finances, business plans, marketing plans, legal affairs, suppliers, clients and potential clients, opportunities, contracts or assets of the Company. Confidential Information also includes any information which has been made available to the Company by another Person and which the Company is obligated to keep confidential.

1.2    "Invention" means any product, computer program, device, technique, know-how, algorithm, method, process, improvement, discovery or invention, whether or not patentable or copyrightable and whether or not reduced to practice, that (a) is within the scope of the Company's business, research or investigations or results from or is suggested by any work performed by me for the Company and (b) is created, reduced to practice, developed, discovered, invented or made by me during the Term, whether solely or jointly with others, and whether or not while engaged in performing work for the Company.

1.3    "Material" means any product, prototype, model, document, diskette, tape, picture, drawing, design, recording, paper, writing or other tangible item which contains or manifests, whether in printed, handwritten, coded, magnetic or other form, any Confidential Information or Invention.

1.4    "Moral Rights" means any right to claim authorship of a work, any right to object to any distortion or other modification of the work, and any similar right existing under the law of any country in the world or under any treaty.

1.5    "Person" means any corporation, partnership, trust, association, governmental authority, educational institution, individual or other entity.

1.6    "Proprietary Right" means any patent, copyright, mask work, trade secret, trade mark, trade name, service mark or other intellectual property right in any Confidential Information, Invention or Material.

1.7    "Term" means the term of my employment with the Company, whether on a full-time, part-time or consulting basis.

**PRIMUS**

## Section 2. Confidential Information, Inventions and Materials; Moral Rights Waiver

2.1     The Company will be the exclusive owner of all Confidential Information, Inventions, Materials and Proprietary Rights. To the extent applicable, all Materials constitute "works for hire" under applicable copyright laws.

2.2     I hereby assign and transfer, or will assign and transfer, to the Company all right, title and interest that I may now or hereafter have in the Confidential Information, Inventions, Materials and Proprietary Rights, subject to the limitations set forth in the notice below. I will take such action as may be requested by the Company to evidence, transfer, or confirm the Company's right, title and interest in the Confidential Information, Inventions, Materials and Proprietary Rights. I will not contest the validity of any Proprietary Rights.

2.3     Except as required for performance of my work for the Company or as authorized in writing by the Company, I will not (a) use, disclose, publish or distribute any Confidential Information, Inventions or Materials or (b) remove any Materials from the Company's premises. I will hold all Materials in trust for the Company and I will deliver them to the Company upon request and in any event at the end of the Term. .

2.4     I will promptly disclose to the Company all Confidential Information, Inventions and Materials, as well as any business opportunity which comes to my attention during the Term and which relates to the business of the Company or which arises as a result of my employment with the Company. I will not take advantage of or divert any such opportunity for the benefit of myself or anyone else without the prior written consent of the Company.

2.5     I hereby irrevocably transfer and assign to the Company any and all Moral Rights that I may have in any work I create for and/or on behalf of the Company. I also forever hereby waive and agree never to assert against the Company, its successors and assigns any and all Moral Rights that I may have in any work, even after expiration or termination of my employment with the Company, howsoever arising.

**NOTICE**: Notwithstanding any other provision of this Agreement to the contrary, this Agreement does not obligate me to assign or offer to assign to the Company any of my rights in an invention for which no equipment, supplies, facilities or trade secret information of the Company was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the Company or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the Company. This satisfies the written notice and other requirements of RCW 49.44.140.

### Section 3. No Conflicting Obligations

3.1     My execution, delivery and performance of this Agreement and the performance of my other obligations and duties to the Company will not violate any other employment, nondisclosure, confidentiality, consulting or other agreement to which I am a party or by which I may be bound.

3.2     I will not use in performance of my work for the Company or disclose to the Company any trade secret, confidential or proprietary information of any prior employer or other Person if and to the extent that such use or disclosure may violate any obligation or duty that I owe to such other Person (e.g., under any agreement or applicable law). My compliance with this paragraph will not prohibit, restrict or impair the performance of my work, obligations and duties to the Company.

**PRIMUS**

## Section 4. Miscellaneous

4.1     This Agreement is not a contract of employment and no rights of employment are hereby created.

4.2     The provisions of this Agreement shall continue to apply after the termination of my employment without limit in point of time, but shall cease to apply to information which may come into the public domain through no fault of my own. I acknowledge, however, that any breach of this Agreement constitutes a disciplinary offence, which may result in the summary termination of my employment with the Company.

4.3     In the event of any breach of or default under this Agreement by me, the Company may suffer irreparable harm and have no adequate remedy at law. In the event of any such breach or default, or any threat of such breach or default, the Company will be entitled to injunctive relief, specific performance and other equitable relief. The rights and remedies of the Company under this paragraph are in addition to, and not in lieu of, any other right or remedy afforded to the Company under any other provision of this Agreement, by law or otherwise.

4.4     This Agreement will be enforced to the extent permitted by applicable law. If for any reason any provision of this Agreement is held to be invalid or unenforceable to any extent, then (a) such provision will be interpreted, construed or reformed to the extent reasonably required to render the same valid, enforceable and consistent with the original intent underlying such provision, and (b) such invalidity or unenforceability will not affect any other provision of this Agreement or any other agreement between the Company and me. If the invalidity or unenforceability is due to the unreasonableness of the scope or duration of the provision, the provision will remain effective for such scope and duration as may be determined to be reasonable.

4.5     The failure of the Company to insist upon or enforce strict performance of any other provisions of this Agreement or to exercise any of its rights or remedies under this Agreement will not be construed as a waiver or a relinquishment to any extent of the Company's rights to assert or rely on any such provision, right or remedy in that or any instance; rather, the same will be and remain in full force and effect.

4.6     This Agreement sets forth the entire Agreement, and supersedes any and all prior agreements, between me and the Company with regard to the Confidential Information, Inventions, Materials and Proprietary Rights of the Company. This Agreement may not be amended, except by writing signed by the party against whom such amendment is sought to be enforced.

4.7     This agreement shall be governed by the English law and be subject to the non-exclusive jurisdiction of the English courts. Further, I will not bring any action relating to this Agreement other than in the court specified in this paragraph.

4.8     I have carefully read all of the provisions of this Agreement and agree that (a) the same are necessary for the reasonable and proper protection of the Company's business, (b) the Company has been induced to enter into and continue its relationship with me in reliance upon my compliance with the provisions of this Agreement, (c) every provision of this Agreement is reasonable with respect to its scope and duration, and (d) I have received a copy of this Agreement.

# PRIMUS

This Agreement shall be effective as of _1st January_, 2001.

_[signature]_
Signature

HOSEIN MOSHADDAS
FULL NAME (print or type)

_____
Social Security Number

**ACCEPTED**: Primus Knowledge Solutions

_[signature]_
Diana Wong, Vice President, Human Resources

Friday, July 02, 2004

Carl Venter
111 Mead Way
Old Coulsdon
Surrey. CR5 1PR

Dear Carl,

On behalf of Primus Knowledge Solutions (UK), it is my pleasure to offer you the position of Sales Consultant with a start date on or before August 2, 2004. You would report to Hosein Moghaddas. Our offer consists of the following:

1. An annualized base salary of £50,000, which is paid monthly.

2. You would be eligible for variable compensation under the terms of your 2004 Sales Plan.

3. The first three months of work will constitute a trial period. During this trial period you or the Company are entitled to terminate this contract without compensation or notice.

4. An option to purchase 4,300 shares of Primus common stock under the terms of the company's Nonofficer Employee Stock Compensation Plan. The exercise price for each share underlying the option will be equal to the fair market value of one share of common stock on the date the option is granted.

5. Twenty days annual leave, the standard UK terms for sickness and all UK public holidays.

6. A car allowance of £500 per month.

7. Life assurance coverage to your dependants in the amount of 4x's your base salary.

8. Private Medical insurance for you at no charge. Dependant medical benefits at your cost.

9. A pension contribution from Primus equal to a maximum of 5% of your base salary per month to be paid in to a Primus nominated Personal Pension Scheme.

10. Opportunity to purchase Primus Common Stock at a 15% discount through the Employee Stock Purchase Plan. Based on the UK Inland Revenue Tax requirements on Employee Stock Purchase Plans, the employee is responsible for applicable taxes. Upon acquisition of shares income tax liability will be assessed. This income tax must be accounted for within thirty (30) days of the acquisition of shares.

Case 1:08-cv-10576-RGS    Document 1-2    Filed 04/07/08    Page 49 of 60

# Exhibit C

C

Monday, 05 July 2004

Carl Venter
111 Mead Way
Old Coulsdon
Surrey. CR5 1PR

Dear Carl,

**Terms and Conditions of Employment**

This letter constitutes your contract of employment with Primus Knowledge Solutions (UK) ("the Company") and incorporates the statement of terms required by law as of the above date.

1. COMMENCEMENT/CONTINUITY

Your employment will commence on or before 2nd August 2004. No previous service counts as continuous for statutory purposes.

2. JOB TITLE AND DUTIES

You are to be employed as a **Sales Consultant.** Your role will include the duties of pre-sales technical support, including evaluating account needs, participating in the sales process and effectively positioning and demonstrating the Primus suite of solutions.

You accept that the Company may, at its discretion, require you to undertake other duties or tasks not within the scope of your normal duties. At all times, you agree to faithfully and diligently perform those duties and exercise those powers which are vested in you and to obey all lawful directions of the Company.

3. PLACE OF WORK

Your place of work is the Company's UK Office located in Slough, or such other place of business of the Company or any Group Company as the Company may reasonably require within a 30 mile radius of your present location. For the purpose of this Agreement, the term "Group Company" shall mean a company which, in relation to the Company is the subsidiary or a holding company of it, or any company which is a subsidiary of any such holding company ("holding company and "subsidiary" having the meanings ascribed to them in Section 736 Companies Act 1985, as amended).

You may be required to travel extensively on business but you will not be required to work outside the UK for longer than three months unless mutually agreed beforehand.

4. RENUMERATION AND BENEFITS

You are remunerated at a basic rate of £50,000 per annum.

You will also be entitled to receive the benefits set out in schedule 2 to this Agreement.

You will be paid monthly in arrears by bank credit transfer and any performance related remuneration will be paid at such times as set out in the then current compensation plan, subject always to your remaining in the employment of the Company, and not serving any period of notice of termination of employment (whether issued by the Company or you) at that time.

## 5. HOURS OF WORK

Your normal hours of work are 9 am to 5:30 pm Monday to Friday with one hour for lunch. You will be expected to work such additional hours as are necessary for the proper performance of your duties. You will not be paid extra for overtime.

The hours which you may be required to work here under are subject to the terms of any Relevant Agreement (as defined in the Working Time Regulations 1998 ("WTR")) applicable to you and the Individual Agreement (attached as schedule 3) opting out of the 48 hour per week limit in Regulation 4 of the WTR.

## 6. HOLIDAY ENTITLEMENT

In addition to statutory holidays, you are entitled to 20 days' paid annual holiday in each holiday year (which runs from 1st January to 31st December) to be taken at such time or times as may be agreed by your manager. Holiday not taken will be forfeited and may not be carried forward to the next year.

For the holiday year during which your appointment commences or terminates, your holiday entitlement will accrue at 1.66 days for each complete calendar month of your employment by the Company in that year. On termination of employment you will receive one two hundred and sixty[th] of annual basic salary for any untaken accrued holiday entitlement in the current holiday year. Similarly, the Company shall be entitled to deduct from any payments that you may be due any salary received for holiday taken in excess of your actual entitlement. The Company reserves the right to require you to take any outstanding holiday during any period of notice.

Your entitlement to statutory leave pursuant to the WTR shall be deemed to be included within the entitlements referred to in this Clause. You shall be deemed to use up your entitlement to statutory leave before any additional entitlement under this Agreement. The provisions of this Clause (as regards the timing of holidays and as regards calculating holiday pay on termination) shall be in substitution for those referred to in Regulations 15(2) and 14(3)(b) respectively of the WTR. This Agreement is a "Relevant Agreement" for the purposes of the WTR.

## 7. INCAPACITY FOR WORK

You will be paid statutory sick pay ("SSP") in respect of sick leave duly certified in accordance with statutory requirements. Your qualifying days for SSP are Monday to Friday. A self-certification form for SSP purposes is available from the Company. A doctors' certificate is required for any incapacity in excess of 7 days (including weekends), and for each 7 days that it continues. After 90 days permanent health insurance coverage is available subject to the rules of the scheme.

In the event of sickness or injury you should notify your immediate report or a colleague by telephone (at or before your normal start time or as soon thereafter as you reasonably can) on the first morning of absence.

## 8. PENSION/CONTRACTING OUT

There is an occupational pension scheme with this employment which you may be invited to join. A contracting-out certificate is in force.

## 9. TERMINATION

After the three-month trial period, notice of termination is by four (4) week's written notice on either side. After the fourth year, the notice of termination shall increase by one (1) additional week for every year of service completed thereafter (i.e. six years of employment = 6 week's notice of termination).

The Company may terminate this Agreement with immediate effect if you:
(a) commit any act of gross misconduct or repeats or continues (after written warning) any other material breach of your obligations under this Agreement;
(b) are guilty of conduct which in the reasonable opinion of the Company brings you, the Company, or any Group Company into disrepute;
(c) commit any act of dishonest, whether relating to the Company, and Group Company, any of its or their employees or otherwise; or
(d) is in the reasonable opinion of the Company incompetent in the performance of your duties.

After the three-month trial period, on serving notice to terminate this Agreement for any reason, the Company shall be entitled (but not obliged) to pay you your basic salary in lieu of any unexpired period of notice.

The Company may at any time (including, but not limited to, during your notice period) require you to perform only some of your duties or alternative duties (as reasonably specified) or no specific duties and may also require you not to attend the offices of the Company unless specifically requested to attend during such period.

The normal retirement age is 60, at which time employment will automatically end in the absence of special agreement to the contrary.

## 10. CONFIDENTIALITY

As a condition of employment, you will be required to sign and return the Confidentiality and Inventions Assignment Agreement attached as schedule 4.

## 11. COMPUTER SECURITY

Misuse of the Company's computer programmes or data (including unlawful access to copying or tampering with the same) is a criminal offence under the Computer Misuse Act 1990 and shall render you liable to summary dismissal as well as risking possible criminal prosecution. You shall also comply with the terms of any computer security policy established by the Company.

## 12. DISCIPLINARY PROCEDURES

At the present time, there are no disciplinary, grievance and appeals procedures connected with this employment; if any are introduced they will be available from the Company Personnel Department at Head Office.

In order to investigate any complaint of misconduct against you, the Company shall be entitled to suspend you on full pay for so long as may be necessary to carry out a proper investigation and hold a disciplinary hearing.

## 13. CHANGES IN TERMS AND CONDITIONS OF EMPLOYMENT

The Company reserves the right to make changes to these terms and conditions from time to time. Any such changes or other agreed changes in these particulars of employment will be notified in writing within 4 weeks of the change taking effect.

## 14. DISCHARGE OF LOANS

You agree to discharge any outstanding loans by the Company including any recoverable commission earnings or other advances of pay or overpayments upon the termination of your employment and you hereby authorise the Company to deduct the amount outstanding from any final pay due to you.

## 15. POST-TERMINATION RESTRICTIONS

During the period of six months after you leave employment you agree not to deal with or contact any client or prospective client or any individual on the company's database, with whom you have in the 12 months previously had dealings, nor seek to entice away any employee of the Company, if such contact in either case is directly or indirectly in connection with any competitive or related or similar business or for any customer of or supplier to the business.

You also agree that for a period of six months following the termination of your employment you shall not be employed by, act as a consultant to, hold any office in, or be in any other way interested in any business which is shall be wholly or partly in competition with the Company or any Group Company within the United Kingdom.

## 16. WHOLE AGREEMENT/JURISDICTION

This agreement together with your offer letter and the documents referenced and attached herein set out the whole agreement between the parties and shall be governed by English law and be subject to the non-exclusive jurisdiction of the English courts.

Please sign and return one copy of this letter as evidence of your agreement to its terms.

Yours sincerely

For and on behalf of Primus Knowledge Solutions (UK) Limited/Inc.

I agree to the above

Signed ............................................ Dated....... 5 June 04

SCHEDULE 1 – Applicable Compensation Plan

Attach the Post-Sales Compensation Plan

TBD

)

)

## SCHEDULE 2 - Benefits

1.   An annualised base salary of £50,000 pounds which is paid monthly.

2.   20 days annual leave, the standard UK terms for sickness and all UK public holidays.

3.   A car allowance of £500 per month.

4.   An option to purchase 4,300 shares of Primus common stock under the terms of the company's Nonofficer Employee Stock Compensation Plan. The exercise price for each share underlying the option will be equal to the fair market value of one share of common stock on the date the option is granted.

5.   Life assurance coverage to your dependants in the amount of 4x's your base salary.

6.   Private Medical insurance for you at no charge. Dependant medical benefits at your cost.

**SCHEDULE 3**

**WORKING TIME REGULATIONS**

**INDIVIDUAL AGREEMENT TO OPT OUT OF THE 48-HOUR LIMIT**

I understand that under Regulation 4(1) of the Working Time Regulations ("the Regulations"), my average weekly working time, including overtime, normally should not exceed 48 hours.

However, under Regulation 4(3), I agree that this provision shall **not** apply to me, and that I voluntarily consent to exceed the 48-hour limit.

I understand that if I wish to re-consider my position regarding this opt-out of the Regulations, and to re-apply the 48-hour limit to my personal working week, I may do so by giving a minimum of three (3) mouths written notice to the Human Resources Department located in our Seattle corporate offices.

A copy of this Agreement is to be held in my Personnel file, and may be inspected by me on request.

Signed: 

Name:   C. Venter

Date:   5/6/04

SCHEDULE 4 – Confidentiality and Inventions Assignment Agreement

CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

In consideration of my employment as an employee or independent contractor with Primus Knowledge Solutions (the "Company"), the opportunities for advancement that such employment provides me, the compensation paid to me by the Company, the understandings set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I agree as follows:

## Section 1. Definitions

Whenever used in this Agreement, the following terms will have the following meanings:

1.1     "Confidential Information" means any information that (a) relates to the business of the Company, (b) is not generally available to the public, and (c) is conceived, compiled, developed, discovered or received by, or made available to me during the Term, whether solely or jointly with others, and whether or not while engaged in performing work for the Company. Without limiting the generality of the foregoing, Confidential Information includes information relating to Inventions or trade secrets, products, services, finances, business plans, marketing plans, legal affairs, suppliers, clients and potential clients, opportunities, contracts or assets of the Company. Confidential Information also includes any information which has been made available to the Company by another Person and which the Company is obligated to keep confidential.

1.2     "Invention" means any product, computer program, device, technique, know-how, algorithm, method, process, improvement, discovery or invention, whether or not patentable or copyrightable and whether or not reduced to practice, that (a) is within the scope of the Company's business, research or investigations or results from or is suggested by any work performed by me for the Company and (b) is created, reduced to practice, developed, discovered, invented or made by me during the Term, whether solely or jointly with others, and whether or not while engaged in performing work for the Company.

1.3     "Material" means any product, prototype, model, document, diskette, tape, picture, drawing, design, recording, paper, writing or other tangible item which contains or manifests, whether in printed, handwritten, coded, magnetic or other form, any Confidential Information or Invention.

1.4     "Moral Rights" means any right to claim authorship of a work, any right to object to any distortion or other modification of the work, and any similar right existing under the law of any country in the world or under any treaty.

1.5     "Person" means any corporation, partnership, trust, association, governmental authority, educational institution, individual or other entity.

1.6     "Proprietary Right" means any patent, copyright, mask work, trade secret, trade mark, trade name, service mark or other intellectual property right in any Confidential Information, Invention or Material.

1.7     "Term" means the term of my employment with the Company, whether on a full-time, part-time or consulting basis.

## Section 2. Confidential Information, Inventions and Materials; Moral Rights Waiver

2.1     The Company will be the exclusive owner of all Confidential Information, Inventions, Materials and Proprietary Rights. To the extent applicable, all Materials constitute "works for hire" under applicable copyright laws.

2.2     I hereby assign and transfer, or will assign and transfer, to the Company all right, title and interest that I may now or hereafter have in the Confidential Information, Inventions, Materials and Proprietary Rights, subject to the limitations set forth in the notice below. I will take such action as

may be requested by the Company to evidence, transfer, or confirm the Company's right, title and interest in the Confidential Information, Inventions, Materials and Proprietary Rights. I will not contest the validity of any Proprietary Rights.

2.3    Except as required for performance of my work for the Company or as authorized in writing by the Company, I will not (a) use, disclose, publish or distribute any Confidential Information, Inventions or Materials or (b) remove any Materials from the Company's premises. I will hold all Materials in trust for the Company and I will deliver them to the Company upon request and in any event at the end of the Term.

2.4    I will promptly disclose to the Company all Confidential Information, Inventions and Materials, as well as any business opportunity which comes to my attention during the Term and which relates to the business of the Company or which arises as a result of my employment with the Company. I will not take advantage of or divert any such opportunity for the benefit of myself or anyone else without the prior written consent of the Company.

2.5    I hereby irrevocably transfer and assign to the Company any and all Moral Rights that I may have in any work I create for and/or on behalf of the Company. I also forever hereby waive and agree never to assert against the Company, its successors and assigns any and all Moral Rights that I may have in any work, even after expiration or termination of my employment with the Company, howsoever arising.

NOTICE: Notwithstanding any other provision of this Agreement to the contrary, this Agreement does not obligate me to assign or offer to assign to the Company any of my rights in an invention for which no equipment, supplies, facilities or trade secret information of the Company was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the Company or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the Company. This satisfies the written notice and other requirements of RCW 49.44.140.

### Section 3. No Conflicting Obligations

3.1    My execution, delivery and performance of this Agreement and the performance of my other obligations and duties to the Company will not violate any other employment, nondisclosure, confidentiality, consulting or other agreement to which I am a party or by which I may be bound.

3.2    I will not use in performance of my work for the Company or disclose to the Company any trade secret, confidential or proprietary information of any prior employer or other Person if and to the extent that such use or disclosure may violate any obligation or duty that I owe to such other Person (e.g., under any agreement or applicable law). My compliance with this paragraph will not prohibit, restrict or impair the performance of my work, obligations and duties to the Company.

### Section 4. Miscellaneous

4.1    This Agreement is not a contract of employment and no rights of employment are hereby created.

4.2    The provisions of this Agreement shall continue to apply after the termination of my employment without limit in point of time, but shall cease to apply to information which may come into the public domain through no fault of my own. I acknowledge, however, that any breach of this Agreement constitutes a disciplinary offence, which may result in the summary termination of my employment with the Company.

4.3    In the event of any breach of or default under this Agreement by me, the Company may suffer irreparable harm and have no adequate remedy at law. In the event of any such breach or default, or any threat of such breach or default, the Company will be entitled to injunctive relief, specific performance and other equitable relief. The rights and remedies of the Company under this paragraph are in addition to, and not in lieu of, any other right or remedy afforded to the Company under any other provision of this Agreement, by law or otherwise.

4.4     This Agreement will be enforced to the extent permitted by applicable law. If for any reason any provision of this Agreement is held to be invalid or unenforceable to any extent, then (a) such provision will be interpreted, construed or reformed to the extent reasonably required to render the same valid, enforceable and consistent with the original intent underlying such provision, and (b) such invalidity or unenforceability will not affect any other provision of this Agreement or any other agreement between the Company and me. If the invalidity or unenforceability is due to the unreasonableness of the scope or duration of the provision, the provision will remain effective for such scope and duration as may be determined to be reasonable.

4.5     The failure of the Company to insist upon or enforce strict performance of any other provisions of this Agreement or to exercise any of its rights or remedies under this Agreement will not be construed as a waiver or a relinquishment to any extent of the Company's rights to assert or rely on any such provision, right or remedy in that or any instance; rather, the same will be and remain in full force and effect.

4.6     This Agreement sets forth the entire Agreement, and supersedes any and all prior agreements, between me and the Company with regard to the Confidential Information, Inventions, Materials and Proprietary Rights of the Company. This Agreement may not be amended, except by writing signed by the party against whom such amendment is sought to be enforced.

4.7     This agreement shall be governed by the English law and be subject to the non-exclusive jurisdiction of the English courts. Further, I will not bring any action relating to this Agreement other than in the court specified in this paragraph.

4.8     I have carefully read all of the provisions of this Agreement and agree that (a) the same are necessary for the reasonable and proper protection of the Company's business, (b) the Company has been induced to enter into and continue its relationship with me in reliance upon my compliance with the provisions of this Agreement, (c) every provision of this Agreement is reasonable with respect to its scope and duration, and (d) I have received a copy of this Agreement.

This Agreement shall be effective as of _____, 20____.

_____
Signature

Carl Venter
FULL NAME (print or type)

_____
National Security Number

<u>ACCEPTED</u>:

Primus Knowledge Solutions

P.P.
Tom Montgomery, Chief Operating Officer, EMEA